APPEAL NO. 24-11128

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

**ESTELLA CURRY,**

Petitioner-Appellant,

vs.

**DEIDRA WRIGHT, WARDEN**,

Respondent-Appellee

On Appeal from the United States District Court for the Southern District of Alabama

**BRIEF OF APPELLANT**

Attorneys for Appellant Estella Curry

Alfred H. Perkins, Jr.
State Bar No.: ASB-3979-R68A
Tyler J. McIntyre
State Bar No.: ASB-1378-G61I
John D. Hemmings, III
State Bar No.: ASB-2728-Y12Q

STARNES DAVIS FLORIE LLP
100 Brookwood Place, 7th Floor
Birmingham, Alabama 35209
Telephone: (205) 868-6000
aperkins@starneslaw.com
tmcintyre@starneslaw.com
jhemmings@starneslaw.com

2920074.1

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to 11th Cir. R. 26.1-1, the Petitioner-Appellant certifies that, to the best of her undersigned counsel's knowledge, the CIPs filed by the Appellant (Doc. 11) and Appellee (Doc. 19) constitute a complete list of all interested persons and corporations.

Dated: October 21, 2024.

i

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellant Curry respectfully requests oral argument. Curry is before this Court on four issues for which she was granted a Certificate of Appealability. Docs 54 and 55, and Doc 21 (Order Granting an Expansion of Issue 2). These four issues encompass several claims for habeas relief that are comprised of significant constitutional violations. Curry requests oral argument to help assist the Court in resolving the numerous constitutional violations she suffered.

## **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ................................................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................... ii

TABLE OF CONTENTS ....................................................................... iii

TABLE OF CITATIONS........................................................................ iv

JURISDICTIONAL STATEMENT ..........................................................v

STATEMENT OF THE ISSUES .......................................................... vi

STATEMENT OF THE CASE ON APPEAL ..........................................1

   I.   Course of the Proceeding and Disposition in the Court Below......................1

   II.   Summary of Pre-Brief Actions in the Eleventh Circuit...................................4

   III.  Statement of the Facts......................................................................5

   IV.  Standard of Review..........................................................................27

SUMMARY OF THE ARGUMENT .....................................................28

ARGUMENT ..........................................................................................29

   V.   Curry's Unwaived Claims: the State's Use of False Evidence and Her Sixth
   Amendment Right to Self-Representation.........................................................29

      A.   The Primary Evidence Used Against Curry was FALSE, and, Under the
      State Precedent of *Watson v. State*, the Evidence Could Not Support a
      Conviction for Reckless Murder. ...................................................................29

      B.   Curry's Sixth Amendment Right to Self-Representation was Violated. .34

      C.   In Denying Curry's Claim Regarding Self-Representation, ACCA
      Unreasonably Applied *Faretta v. California*, 422 U.S. 806 (1975). ..............44

   VI.   Curry's Procedural Default Should be Excused and her Substantial Claims
   Reviewed…………………...................................................................................46

   VII.   Curry Qualifies for the Fundamental Miscarriage of Justice Exception .47

CONCLUSION…………….....................................................................52

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS,
TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS...........55

CERTIFICATE OF SERVICE ..............................................................55

## <u>TABLE OF CITATIONS</u>

<u>**Cases**</u>                                                                        **Page(s)**

*Allen v. State,* 611 So.2d 1188 (Ala. Crim. App. 1992) .................................. 34, 49

*Calderon v. Thompson*, 523 U.S. 538 (1998)..............................................................48

*Coleman v. Thompson*, 501 U.S.722 (1991) ..............................................................48

*Dickerson v. Alabama,* 667 F.2d 1364 (11th Cir. 1982)...........................................5

*Edwards v. Carpenter*, 529 U.S. 446 (2000)..............................................................48

*Faretta v. California*, 422 U.S. 806 (1975)...............................1, 35, 36, 37, 45, 46

*Howard v. Barrett*, No. 4:12-cv-01845-KOB-JEO,
    2014 U.S. Dist. LEXIS 116486 (N.D. Ala. Aug. 21, 2014 .................................52

*Johnson v. Alabama*, 256 F.3d 1156 (11th Cir. 2001)............................................48

*Maharaj v. Sec'y for Dep't of Corr.*,  432 F.3d 1292 (11th Cir. 2005)……………28

*Miller v. Pate*, 386 U.S. 1, S.Ct. 785 (1967)..................................................... 30, 31

*Miller-El v. Cockrell*, 537 U.S. 322 (2003)...............................................................28

*Napier v. State*, 357 So.2d 1011 (Ala. 1978) ..................................................... 34, 49

*Sears v. Warden GDCP*, 73 F.4th 1269 (11th Cir. 2023) ........................................45

*Stewart v. Sec'y. Dep't of Corr.*, 476 F.3d 1193 (11th Cir. 2007)............................28

*Watson v. State*, 504 So.2d 339 (Ala. Crim. App. 1986)....................32, 34, 35, 50

*Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, L. Ed.2d (2000)......................45

*Wood v. Allen*, 558 U.S. 290 (2010) ........................................................................28

**Statutes**

28 U.S.C. §2553 ............................................................................. *passim*

28 U.S.C. §2554 ............................................................................. *passim*

## <u>JURISDICTIONAL STATEMENT</u>

The district court had jurisdiction upon the timely filing of a Petition for Writ of Habeas Corpus on December 7, 2020, pursuant to 28 U.S.C. § 2254. Final judgment was entered on March 14, 2024 which dismissed Petitioner-Appellant's claim while granting her a Certificate of Appealability. Petitioner-Appellant filed a timely Notice of Appeal on April 11, 2024. This Court has jurisdiction pursuant to 28 U.S.C. § 2253.

2920074.1

## STATEMENT OF THE ISSUES

1.    Does Curry qualify for the *Martinez* exception to establish cause for the procedural default of her ineffective-assistance-of-trial-counsel claims?

2.    Was the Alabama courts' ruling that Curry never made a clear and unequivocal request for self-representation based on an unreasonable determination of facts in light of the evidence?

3.    Was Curry's conviction for reckless murder based on insufficient evidence when the indictment and the jury instructions alleged that Curry was under the influence of "controlled substances" at the time of the offense, but the evidence at trial suggested she was under the influence of prescription medications that were not technically "controlled substances"?

4.    Whether, in denying Curry's claim that she was deprived of her constitutional right to self-representation, the state court reasonably applied clearly established federal law, namely, *Faretta v. California*, 422 U.S. 806 (1975), in concluding that Curry was not entitled to relief?

## STATEMENT OF THE CASE ON APPEAL

### I.    Course of the Proceeding and Disposition in the Court Below

On December 7, 2020, Petitioner-Appellant, Estella Curry[1], timely filed a Petition for Habeas Relief, challenging her 2017 Alabama conviction and life sentence for reckless murder for causing the death of another interstate driver "while under the influence of one or more controlled substances." Doc. 1-1. Curry's petition alleged several constitutional violations, as well as a claim of actual innocence. *Id.* at pp. 16-18. Some of Curry's constitutional claims include:

(1)    the knowing use of false evidence by the District Attorney to indict, convict, and sentence her;

(2)    the repeated denial of her clear and unequivocal requests to represent herself by the circuit court judge;

(3)    several instances of ineffective assistance of counsel ("IATC") repeatedly committed before and during trial by the court appointed counsel forced upon Curry by the circuit court over her continued objection, as well as IATC committed during sentencing, direct appeal, and collateral appeal, including:

(a) failing to investigate and/or seek expert assistance with exposing the State's false use of evidence of Curry driving under the influence of "opiates", and

---

[1] Curry is incarcerated at Alabama's Julia Tutwiler Prison for Women in Wetumpka, Alabama.

the States unreliable and unscientific determination of her pre-crash speed, and presenting any kind of defense case;

   (b) repeatedly failing to effectively cross-examine witnesses, denying Curry her right to subject the State's case to a meaningful adversarial testing;

   (c) failing to investigate or present mitigating and exculpatory evidence at trial and during sentencing including Curry's decades of honorable military service and her significant medical conditions and thyroid cancer;

Doc. 1-1, pp.16-18. Curry asked the district court for habeas relief or an evidentiary hearing. Doc. 1-1, p. 46.

  On March 15, 2021, the State Answered, claiming Curry's causes of action were either procedurally defaulted or lacked merit. Doc. 12. On May 14, 2021, Curry filed a Reply arguing that default had not occurred on her false evidence or her Sixth Amendment claims, and that default on the others was excused for cause and because she is actually innocent. Doc. 17. With her Reply and a Supplement thereto (Doc. 29), Curry also submitted new reliable evidence including:

  (1) a Declaration by the State's own toxicologist who testified at Curry's trial, who declared Curry had no "opiates" or "controlled substances" in her blood at the time of the car crash (Doc. 17-5.);

  (2) a Declaration from the Director of Mississippi Poison Control, a board-certified emergency room physician and doctor of toxicology, who in addition to

opining Curry had no "opiates" or "controlled substances" in her blood, also testified that Curry's prescribed IBS medication, "tricyclic anti-depressant" (prescribed as a sleep aid due to military sexual trauma/PTSD), muscle relaxer, and diphenhydramine were all found at therapeutic levels at the time of the crash (Doc. 17-4.); and

(3)    two Declarations by a certified accident reconstructionist opining that the State's testimony on "slap-marks" by two State Troopers that Curry's pre-crash speed was probably 126 to 128 mph is not scientifically reliable evidence (Doc. 17-6); by using the correct formula populated with data not used by the State, Curry's pre-crash speed was actually 96 to 98 mph. (Doc. 29-1).

Curry renewed her request for habeas relief and/or an evidentiary hearing. Doc. 17, p. 34; Doc. 29, p. 13.

Three years later, on January 31, 2024, a magistrate judge issued a Report and Recommendation, finding that an evidentiary hearing was unnecessary as Curry's claims were procedurally defaulted or lacked merit, but recommending the issuance of a COA on the first three issues detailed above. Doc. 50. Curry filed Objections. Doc. 51. In response to the Report's finding that Curry never "clearly and unequivocally" invoked her right to self-representation, Curry cited to the January 31, 2017 pre-trial hearing transcript where Curry clearly stated, "Your Honor, can I ask you if I can represent myself," and the court replied, "No, ma'am. At this point

3

I deny that. You can ask, but it's denied." Doc. 51, p. 32. The State filed a Response agreeing with the Report but arguing a COA was not warranted. Doc. 52.

On March 15, 2024, the district court issued a Memorandum Opinion and Order overruling Curry's Objections and adopting the Report and Recommendation. Doc. 53. In denying the self-representation claim, the district court said it was unable to find the January 31, 2017 transcript in the record and Curry could not raise new evidence now. Doc. 53, pp. 9-10. The court denied with prejudice Curry's Petition but issued the recommended COA. Doc. 54.

## II.   <u>Summary of Pre-Brief Actions in the Eleventh Circuit</u>

On June 17, 2024 Curry filed a Motion to Supplement the Record and Expand Issue Two, asking this Court to (1) supplement the record with the missing pre-trial transcript in the interest of justice and citing to the Court's decision in *Dickerson v. Alabama*, 667 F. 2d 1364, 1367 (11th Cir. 1982) as the transcript is dispositive on the self-representation claim, and (2) asking the Court to expand Issue Two to also allow argument under 28 U.S.C. §2254(d)(1) (whether the State court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law). *See* Doc. 20. On September 9, 2024 Justice Newsom entered an Order denying supplementation of the record but granting expansion to the COA and drafting Issue Four, listed above. Doc. 21.

### III.    Statement of the Facts

#### The Accident

On Wednesday, May 7, 2014, just after 1:00 p.m., Rusty Walker was driving along a rural stretch of I-65 northbound, ten miles north of Atmore in Escambia County, Alabama. Doc. 12-3, pp. 641-642. [2] Walker was in his lifted, 2006 silver Tacoma pickup talking on his cellphone to his wife as he cruised in the left lane at approximately 78 to 80 mph. *Id.* at 629; 642. A witness, traveling 45-50 feet back in the slow lane, watched as a 2009 BMW 335i quickly approached in the left lane, slightly left to the centerline of the truck. *Id.* at 642. The BMW's brake lights never illuminated, the pick-up never reacted to the on-coming sedan, and they collided. *Id.* at 645; 701. The low sports sedan went under the bed of the lifted pickup. *Id.* at 644. The truck flipped on its side and off the highway (elevated slightly in this stretch) and flipped several times in the grass off the right side of the interstate. *Id.* Walker had not been wearing his seatbelt and his airbag was inoperable. Doc. 12-4, p. 765; Doc. 29-1, p. 2004. He was thrown from his pickup and died. Doc. 12-3, p. 662.

The BMW, crushed into the pavement and its tires blown, turned to the left, travelled down the inside grassy slope, up the other side, and a short distance up the

---

[2] The State attached the entire state trial record, direct appellate record, and collateral appeal record to their Response (Doc. 12). References in the record and all other filings in this matter are made to the document number and "PageID #" assigned by PACER. 11th Cir. R. 28-5.

opposite side of the highway, before turning back into the grassy median and coming to a rest. Doc. 12-3, p. 662; 696-697. Estella Curry, a 47-year-old African American woman and former Army Military Police officer from Madisonville, Louisiana, was driving the BMW. Doc. 1-1, p. 31. She was wearing her seatbelt, her airbags deployed, and she survived. Doc. 12-6, p. 1177.

### The Accident Scene

Once paramedics arrived, they determined Curry had an altered mental status; she did not answer questions appropriately, only repeating, "God was driving." Doc. 12-6, pp. 1174-1175. Alabama State Trooper Robert Sprotte, the first law enforcement officer on the scene, testified later that Curry had no signs of inebriation but, "[s]he was not making any sense to me." Doc. 12-4, p. 767. Sprotte asked her what happened several times. She only repeatedly replied, "God had done it," or "God told [me] to do it." *Id.* at 784.

### Evidence Collection at Atmore Community Hospital

Curry arrived at the local ER at 3:00 p.m. Doc. 12-6, p. 1175. Triage recorded that she had a "flat affect" and that she "will not answer any questions states god was in charge and god was driving." *Id.* At trial, Nurse Landra Qualls, a nurse who collected Curry's blood and urine for law enforcement, testified that Curry failed to properly answer medical questions, such as if she was in pain or injured, repeatedly

replying with "God made her do it." Doc. 12-4, p. 845. Despite these concerning behaviors, Qualls testified that Curry was "coherent." *Id.* at 848.

Blood and urine were collected subsequent to Trooper Law's request at 3:15 p.m. Doc. 12-6, p. 1188. A basic physical exam was performed, but no effort was made to determine why Curry continued to exhibit an altered mental status. *Id.* at 1177-78. At 4:00 p.m., an ethanol blood test came back negative. *Id.* at 1180. At 7:28 p.m.—four hours after Curry's blood was collected for the forensic lab and six hours after the accident—the hospital collected a second urine sample. *Id.* at 1179. A rapid urine drug screen ("UDS") resulted at 9:00 p.m. with positive results for "opiate" class and "tricyclic antidepressant" class medications. *Id.* However, printed below the rapid screening results, the hospital's lab provided the following notice:

> NOTICE: **These drug screens are for medical purposes <u>only</u>. They are <u>not</u> intended for legal use.** This laboratory is not NIDA certified. A preliminary POSITIVE test result for a specific drug indicates that the sample **<u>may</u>** contain drug/drug metabolite near or above the cutoff level. <u>It does **not** indicate the level of intoxication or the specific concentration of drug</u> in the urine sample.

Doc. 12-6, p. 1179 (emphasis added). No other medical care was provided, and Curry was discharged after midnight to a family member from Atlanta. *Id.* at 1180.

### Forensic Analysis of Curry's Blood Sample

The Alabama Department of Forensic Sciences lab received the blood and urine samples on May 9, 2014. Doc. 12-4, p. 873. Michael Weaver, a state-employed

chemist and forensic toxicologist with over 25 years of experience, tested Curry's blood. *Id.* at 869. No alcohol was present. *Id.* at 888. He also determined that Curry's blood—taken just two hours after the accident and four hours **before** the urine for the hospital's rapid UDS—did **NOT** test positive for opiates, narcotics, amphetamines, barbiturates, cocaine, cannabinoids, or <u>ANY</u> type of controlled substance, legal or illegal. Doc. 12-6, p. 1210. Curry's blood tested positive for only *therapeutic* quantities of (1) Elavil, a tricyclic antidepressant, (2) a metabolite of Elavil; (3) Flexeril, a muscle relaxer, (4) Bentyl, an IBS medication, and (5) diphenhydramine, an antihistamine. *Id.* Her VA providers had prescribed the first three medications to her, and diphenhydramine is the active ingredient in many over-the-counter allergy products. Doc. 17-1, pp. 1698-1699.

### Pre-Trial Period, May 7, 2014 – June 11, 2017

Two months later, on August 13, 2014, despite having the forensic report, Trooper Sprotte swore out a warrant for Curry's arrest, claiming he had probable cause to believe Curry committed reckless murder of another "<u>while under the influence of opiates and tricyclic anti-depresants</u> [sic] and while driving at a high rate hit another vehicle." Doc. 12-1, p. 157. On October 31, 2014, the Escambia County DA, Stephen Billy, presented his case against Curry to the grand jury. *Id.* at 168. Curry was indicted on one count of reckless murder in violation of Alabama Code §13A-6-2(a)(2) for causing the death of another by engaging in reckless

8

conduct, "to-wit: driving at a high rate of speed and, <u>while under the influence of one or more controlled substances</u>" despite the State having in hand undeniable proof that there were **<u>no</u>** "opiates" or controlled substances of any type in Curry's blood. *Id.* She was arrested on September 9, 2014 and released on bond the next day. Doc. 12-1, p. 133.

Curry initially retained attorney Everette Price, but he withdrew on October 23, 2014 for unstated reasons. *Id.* at 167. On January 20, 2015, at an arraignment hearing, the court declared Curry indigent and assigned Leon Hartley as her public defender; however, during the hearing Curry was "very argumentative," so Hartley was allowed to withdraw, the court rescheduled the arraignment, and "withheld appointing counsel." *See* Doc 12-1, p. 134. On this day, Curry was also required to fill out an "Affidavit of Substantial Hardship and Order." *Id.* at 177-78. On this form-affidavit, Curry handwrote in three different locations she did not want a PD, including writing and signing the very clear and unequivocal statement at the bottom of both pages reproduced below:



Doc 12-1, p. 177 (emphasis added).

9

Curry's arraignment was delayed to allow her to attend to some medical issues and so she could find new counsel. *Id.* at 133-34, 153-54, 156. However, that spring, she missed an arraignment date, and on June 23, 2015, she was arrested and placed in confinement at the Escambia County Jail. *Id.* at 153; 197.

On July 29, 2015, attorney Dwayne Brown filed a notice of appearance. *Id.* at 199. Over the next few months, Curry became dissatisfied with Brown's minimal efforts and lack of communication and filed a series of pro se motions asking the court to remove him. *Id.* at 231 (Mot. 1), 238 (Mot. 2), 250-51 (Mot. 3). She also filed two requests asking that she be provided copies of the evidence against her. *Id.* at 231, 238. The court denied Curry's motions ruling it would only consider pleadings filed by her attorney of record. Doc 12-1, p. 239, 249. On August 4, 2016, Brown filed a motion to withdraw. *Id.* at 262-63. On August 9, 2016, the court issued an order granting Brown's motion, and sua sponte deemed Curry indigent, appointing Shane Cooper as her court-appointed attorney. *Id.* at 264. A hearing was not held and there is no documentation or rationale for how the court made this decision. *See id.* Certainly, it could not have been her monthly income, as she indicated to the court on the Affidavit of Hardship that she made $4,500 a month and had $2,650 in disposable income. *See id.* at 177-78.

Curry still intended to select and employ her own counsel. She *never* acquiesced to the court forcing a second court-appointed attorney on her. She filed a

10

motion requesting Cooper's removal on December 6, 2016. *Id.* at 270-71. She argued Cooper was not requested by her but was appointed by Judge Rice and was essentially acting on behalf of the court because he was "ignoring obvious judicial errors and/or omissions…delaying and/or denying the defendant [sic] 6th Amendment rights," and ignoring Curry and her family's efforts to figure out what he was doing. *Id.* In response, the court set the motion to be heard on January 31, 2017. *See id.* at 143. Curry attempted to file two additional motions arguing that Cooper was forced on her and that he was woefully incompetent, but the court ignored them and forwarded them to Cooper. Doc. 12-1, p. 272; 288 (Mots., dtd Jan. 11, 2017); *see* Doc. 12-1, p. 296 (Letter, dtd Jan. 23, 2017, from circuit clerk to Curry notifying her that the motions would not be considered and were sent to Cooper.)

At the January 31, 2017 hearing, Curry first explained that Cooper should be removed because he was not communicating with her, not even informing her of the hearing for that day. Doc. 20, Ex. A, 2:14-15; 3:9-16.[3] In response, Judge Rice told Curry:

---

[3] The hearing transcript was never made part of the original trial or appellate record, but was discovered by Curry's habeas team, who unsuccessfully attempted to supplement the record at the 11th Circuit. *See* Mot. Supp. R. and Expand Cert. Appealability, Doc. 20, and Doc. 21, J. Newsom's order, denying supplementation. Curry strongly urges the merit panel to reconsider and vacate this portion of Justice Newsom's order and supplement the record for the reasons set forth in Doc. 20. Fed. R. App. P. 27-1(g).

> **THE COURT:** No. You don't get to choose your lawyer. You have been found to be indigent. You don't get to choose your lawyer, the Court picks your lawyer.

Doc. 20, Ex. A, 3:17-20 (emphasis added). Then at the end of the hearing, after a colloquy with Judge Rice in which Curry protested the court's decision to keep Cooper in place, the following exchange occurred:

> **DEFENDANT:** Your Honor, can I ask you if I can represent myself.
>
> **THE COURT:** No, ma'am. At this point I deny that. You can ask, but it's denied.

Doc. 20, Ex. A, 15:21-24 (emphasis added). The trial court *denied* Curry's clear and unequivocal request to represent herself and *forced* Curry to continue to be represented by incompetent counsel hand-picked by the court. Doc. 12-2, p. 297. Judge Rice also set her case for trial on the June 12, 2017 Jury Term. *Id.* at 298.

At the beginning of June, Curry filed three motions. The first asked for a venue change due in part to the "court forced defense attorney's lack of competence and/or ineffective assistance." *Id.* at 299. The second directly asked for Cooper's removal again. *Id.* at 301. The final motion asked for Judge Rice to recuse himself because, among other things, Judge Rice had "**[d]enied Sixth Amendment rights, forced**

12

representation by appointing [an] attorney not requested [by me]. **Denied request for self-representation**." *Id.* at 302. Judge Rice denied all three motions, because Curry was represented by counsel, and he would only hear motions from Cooper. *Id.* at 300; 304.

### June 12, 2017 Hearing and Curry's Second Attempt to Represent Herself

On June 12, 2017, on the morning Curry's murder trial was to begin, Cooper filed a Renewed Motion for Mental Examination. Doc 12-1, pp. 311-12. In it, Cooper wrote that Curry had previously moved to represent herself and could do so again, but he was concerned she was not competent to represent herself. *Id*. at 312. During the hearing on this motion, Curry made numerous clear and unequivocal requests for self-representation that Judge Rice simply ignored. Cooper began the hearing by saying to Judge Rice:

> She has, in the past, requested that I be replaced. And that request was denied. And I don't know if the Court's basis for that was that she's not competent to represent herself, because that's her request. She has and she continues that request this morning. She insisted that she is competent to represent herself and would prefer to do it herself.

Doc 12-2, p. 442 (emphasis added). This is a <u>second</u> clear and unequivocal request for self-representation, this time made by Cooper on Curry's behalf. The DA stated

13

that Curry is competent but "has played games ever since the beginning of this case."
*Id.* at 443. Cooper responded, "If she's competent, I think the court needs to grant
her request to represent herself." *Id.* at 446. Judge Rice addressed Curry directly:

```
          So you're saying that she's telling you
     she wants to be her own attorney, she wants to
     represent herself in this matter?
          Is that what you're saying, Ms. Curry?
     You want to be your own lawyer and represent
     yourself in this trial?
```

*Id.* at 446. Curry responded, "Judge Rice, I said that from the beginning." a reference
to the January 31, 2107 hearing and a confirmation of Cooper's request for her. *Id.*

After a back and forth, Judge Rice asked Curry a second time, "What I'm
asking you is do you want to be your own lawyer in a murder trial?" Doc. 12-2, p.
447. Curry responded, "Your Honor, again, I ask for him [Cooper] to be removed
from the case. I didn't ask for him in the beginning." *Id.* The court entered into a
long conversation with Curry about her past attorneys, to which Curry responded
that two attorneys were forced upon her. *Id.* at 448-49. Curry then stated that she had
never spoken to Cooper about the case. *Id.* at 449. Cooper confirmed, "**Judge, we
have never once had a conversation about the facts of this case.**" *Id.* at 450. Curry

14

responded that this is because Cooper only spends a few minutes at the jail before he leaves. *Id.*

Judge Rice did not inquire about this alarming comment from the attorney he assigned to defend this jailed women who was to go on trial for murder in minutes. Instead, the court continued to blame Curry and argue with her that she had had attorneys in the past, and the court assigned Cooper "because it appeared you were indigent and were unable to afford to hire an attorney," and Cooper "has a long background of experience in handling criminal cases." *Id.* at 452. Curry responded:

> **DEFENDANT:** He hasn't well represented me,
> though. And he wasn't –– he wasn't –– it wasn't
> someone I requested. And I do believe I still have
> my 6th Amendment right.

Doc. 12-2, p. 452 (emphasis added). Again, a reference by Curry to her right to represent herself over being represented by Cooper.

The court returned to Curry's competency. After some discussion, the court created an impossible situation, by recognizing Curry's competency but insisting that her murder trial would occur without further delay:

15

> I want the record to reflect, <u>Ms. Curry,</u> you are <u>extremely articulate, you are very intelligent,</u> you're talking about constitutional rights. It's obvious that you have a grasp of the charges that are against you. <u>You understand what this whole process is about.</u>
>
> And she's shaking her head yes.
>
> **DEFENDANT:** Yes.
>
> **THE COURT:** And the Court is satisfied that you are competent to stand trial. And, therefore, I am not going to postpone this trial. <u>We will proceed to trial and we will begin with jury selection a little later this afternoon.</u>

Doc. 12-2, p. 455 (emphasis added).

A short while later, after determining Curry was competent, the judge asked a second time, "Are you asking to represent yourself and not have a lawyer at all? Is that what you want?" *Id.* at 461. Curry replied, "Your Honor, **I <u>have asked</u> to represent myself [today]** <u>but to be given adequate time to prepare for that representation</u>." Doc. 12-2, p. 461. Then Judge Rice asked a third time, "We've appointed counsel for you who is learned in the law and experienced. So are you asking this Court to, in essence, cut your relationship off from your existing

16

lawyer?", to which Curry replied, "That is correct, your Honor." *Id.* at 464. A third clear and unequivocal assertion that Curry wanted to represent herself.

Judge Rice proceeded with a *Faretta*-like colloquy inquiring whether he would "permit [Curry] to represent [her]self". *Id.* at 465. During this inquiry, he stated, "You indicated that you wish to represent yourself or to make the decision to represent yourself," and, "You're asking to represent yourself, we need to make certain about some of your background," and, "you're going to represent yourself and the Court thinks that is an unwise decision." *Id.* at 466, 473, 478. Curry continued to state that she wanted to represent herself over being represented by Cooper, but she wanted time to prepare, which the judge also repeatedly said he was not going to grant her. *Id.* at 478. Judge Rice decided to delay the trial until the next day and asked Curry again if she wanted to represent herself, to which Curry said she needed time to think about it and make an informed decision. *Id.* at 478-479.

In response to what had just transpired, Cooper stated at the end of the hearing, "And I would, to make the record clear, move at this time, based on that filing, based on everything that has been said in court today by Curry, again to withdraw so that her 6th Amendment right to represent herself is not violated." *Id.* at 482. Despite Curry making repeated, clear and unequivocal requests and her attorney's oral motion, the judge stated because he did not have a formal *written* request stating Curry wanted to be her own lawyer, he would not rule on Cooper's oral motion to

17

withdraw. *Id.* at 482. Curry responded, "**<u>I asked in January [at the hearing], when</u>** **<u>we were here [in court] in January I asked in writing [after the hearing] and</u>** **<u>you denied that</u>**." Doc 12-2, p. 483.

Judge Rice continued, "But at this point in time, what you have told me is that you're trying to decide whether you want to represent yourself. So, at this point, we're still full speed ahead, Mr. Cooper. <u>And we will look to begin the trial</u> <u>tomorrow morning</u> **unless I hear otherwise**." *Id.* at 489. Cooper objected, stating that the court's ruling was inconsistent, the case had now been placed in a "more precarious position" based on what transpired at the hearing, and presciently, stated, "**We'll be no more prepared tomorrow.**" *Id.*at 490-91.

Cooper immediately forced Judge Rice's hand by filing a formal, written Motion to Withdraw, stating that Curry "has clearly indicated, <u>by her statements in</u> <u>open court and previous pro se filings</u>, her desire to have me removed as counsel, that she does not seek a replacement attorney, and if given time to prepare, <u>she would</u> <u>prefer to represent herself</u>." Doc. 12-1, p. 315.

The following day, just before the start of the trial, the judge asked if the defense was ready, to which Cooper responded, "Defense is ready except for the pending motion." Doc. 12-2, p. 492. In response, the judge stated, "**And I've** **reviewed your motion, and it is denied.**" *Id.*; Doc. 12-1, p. 320 (formal denial). Judge Rice was simply not going to allow a women he had declared was

18

"competent," "extremely articulate," and "very intelligent" to represent herself over the attorney Judge Rice hand-selected, despite the fact that Cooper stated he had never spoken to his client about the facts of the case after a year as her counsel. And so the trial began.

## Trial, June 13 – 15, 2017

### Matt Holsonback, Eyewitness to the Crash

Matt Holsonback, the eyewitness who was riding in the slow lane at 78 mph, who intently watched the crash occur, and who found Walker deceased after the crash, was called to the stand. Doc. 12-3, pp. 641-71. Holsonback testified that Walker had been traveling with him for many miles and had just started easing ahead of him, perhaps going a half-mile faster than his cruise-regulated 78 mph. *Id.* at 642. On cross and re-direct, Holsonback testified he was counting the seconds after Curry's vehicle passed him until it hit Walker's pick-up because of his training in the Navy. *Id.* at 650-53. He counted two full seconds passed and estimated the distance between his van and the pick-up had been 45 to 50 feet. *Id.*

### Trooper Stephen Sprotte, Accident Investigator

Trooper Sprotte testified next. Doc. 12-3, pp. 659-780. Besides discussing explaining how the accident occurred (as outlined above), Sprotte also explained that he had two weeks of "Traffic Homicide School" where they discussed "slap marks." *Id.* at 729-34. Slap marks occur when a vehicle's speedometer needle "slaps" an

19

odometer's face during a crash, leaving a scratch. *Id.* Over objection, Sprotte testified that because BMW did not include a "black box" in this model, he had to estimate Curry's pre-crash speed using the slap mark on her speedometer. *Id.* Sprotte was permitted to testify that the slap mark on Curry's speedometer indicated she was traveling between 126 and 128 mph. *Id.*

Cooper's cross-examination of Sprotte made it clear he failed to investigate the crash or consult with an accident reconstructionist. He did not challenge Sprotte with the body of scientific literature proving that "slap marks" are notoriously unreliable. Cooper also failed to consult with a physician about the signs of concussion, shock, and/or psychosis so that he could properly cross Sprotte on Curry's strange behavior on scene. Although Sprotte testified that Curry "wasn't making any sense to me" when he questioned her, Cooper's cross only focused on "inebriation." Doc. 12-4, pp. 767. He did not question Sprotte on the fact that she had no "opiates" or "controlled substances" in her blood prior to swearing out her arrest warrant.

**Todd Grimes, the State's Accident Reconstruction "Expert"**

Grimes, a retired State Trooper was called next. Doc. 12-4, pp. 793-816. The court recognized him as an expert in accident reconstruction due to his training and experience as a law enforcement officer and instructor at the two-week long "Traffic Homicide School." Grimes testified that there are two formulas for estimating pre-

20

crash speed, a simpler "Slide to Stop" formula, and a more difficult "inline momentum formula." The simpler formula <u>requires</u> that the vehicle apply its brakes to create a measurable skid mark, while the inline momentum formula requires that the speed of one vehicle be known. *Id.* at 800-801.

Turning to the actual crash, Grimes testified he used the Slide to Stop formula because he did not know the speed of either vehicle. *Id.* 800-01. To properly estimate Curry's speed, he "needed to know <u>exactly</u> where the first skid marks appeared," and accurately consider the various lengths of the paths the BMW took across the grassy embankments and the highway's surface. *Id.* at 804. Grimes estimated a speed range of 112 to 123 mph with the Slide to Stop. *Id.* at 805. However, in making his estimate, Grimes did not "account for crush" when the vehicles collided, and he thought the "slap mark" indication of 128 mph was more accurate. *Id.* at 806-08.

Cooper made no objections during Grimes' direct and did not challenge his use of the Slide-to-Stop formula on cross or that ultimately relied on the "slap mark" to estimate Curry's speed. Even without an expert, he had three excellent reasons to do so if he had listened and been aware of the evidence. First, by his own testimony, Grimes testified that to use the Slide to Stop, he had to know "exactly" where Curry first applied her brakes and caused a skid mark, but Holsonback and Sprotte both testified Curry <u>never</u> applied her brakes. Doc. 12-3, p. 645 (Holsonback); p. 701 (Sprotte). Grimes also did not account for elevation changes the BMW crossed in

21

the grassy median, and the fact that the sedan travelled in a curving, non-linear path. Doc. 17-6, p. 1816-17. Secondly, Grimes *did* have a reliable pre-crash speed estimate for one vehicle—Walker's pick-up. Holsonback had his speed set at 78 mph and testified that Walker was going only slightly faster. Doc. 12-3, p. 642. Grimes should have used the inline momentum formula. Finally, Holsonback stated he and Walker were 45 to 50 feet apart at the time of the crash and he purposefully counted two full seconds before the impact. That would create a speed estimate of 93 to 96 mph, 33 to 38 mph below (and much closer to that determined with the inline formula). *See* Doc. 29-1.

### Landra Qualls, Emergency Room Nurse

Qualls was the nurse who collected the evidence for the State Police at the Hospital on May 7, 2014. Doc. 12-4, 838-54. Qualls testified that Curry's UDS was "positive for opiates and tricyclic antidepressants," and she could not treat Curry for pain because "she already had stuff in her system." *Id.* at 847.

Again, Cooper had clearly not looked at the evidence or consulted with anyone, because he did not cross Qualls on the fact that the blood taken four hours BEFORE the urine sample for the rapid UDS proved that there were no opiates (or narcotics, barbiturates, amphetamines, etc.) in Curry's system at the time of the crash. He also did not challenge her with the notice in the hospital records that the UDS results should not be used by law enforcement. Instead, he asked Qualls if

ingesting poppyseeds could have caused the positive results (Doc. 12-4, p. 851), which then allowed the State to ask what opiates could also mean, to which Qualls answered, "Oxycodone, Percocet, morphine…[and] methadone." *Id.* at 852.

**Michael Waver, the State's Toxicologist who Tested Curry's Blood**

Weaver testified about the prescription medications and diphenhydramine found in Curry's blood as detailed above. Doc. 12-4, pp. 868-905. The State did not ask Weaver, a trained toxicologist, about the positive UDS results for opiates versus the lack of opiates or any controlled substance found in her blood. Neither did Cooper. Instead, the State's direct focused on the fact that Elavil, Flexeril, and diphenhydramine have "warning labels" that state they can cause drowsiness, and that Curry should not have been driving on them. *Id.* at 891-92.

Cooper clearly had made no attempt to compare the UDS results to the toxicology report as he did not ask Weaver about it, nor did he ask if any of the medications were controlled substances. Cooper also did not make Weaver admit the prescription medications in Curry's blood were found in therapeutic doses. Instead, he sarcastically and irrationally asked Weaver if he knew what the metric system was when asking about the nanograms of medication found in Curry's blood versus the milligrams of each drug found in the pills she took. Doc. 12-4, pp. 897-99.

23

**No Defense Case Presented & Verdict**

The State rested after Weaver testified. Doc. 12-5, p. 910. Cooper made no attempt to put on a real defense case. The only witness he called was a 911 operator to have them testify that no one called around noon on May 7, 2014 to report a BMW driving recklessly down I-65. *Id.* at 912-14. The State asked no questions on cross, and Cooper rested. *Id.* Instructions were given and closing arguments were made.[4] *Id.* at 919-20. After deliberating for an unknown amount of time, the jury returned a guilty verdict. *Id.* at 952-53.

## <u>Sentencing Hearing, August 9, 2017</u>

Before her sentencing hearing, Curry hired attorney Kyle Henderson. He made an appearance on July 25, 2017. Cooper withdrew two days later. It is obvious from the sentencing hearing transcript that Henderson failed to investigate his client's extensive military background and her relevant medical history. Curry's military service records span over twenty years of service in the National Guard, Active Army, and Reserves—mostly in the Military Police in the 1980's and 1990's. Doc. 1-1, p. 31. Curry developed severe hypothyroidism which prevented her from earning a military pension, but she received an Honorable Discharge and separated as a Staff Sergeant. *Id.* She received a Meritorious Service Medal (a rare award for

---

[4] Again, Judge Rice did not order that closing arguments for the DA or the defense counsel he appointed to defend Curry be recorded. Doc. 12-4, p. 920.

a Staff Sergeant) for her "exceptionally meritorious service" as the leader of Redstone Arsenal's MP Special Response Team. *Id.* She was made an Honorary Deputy Sheriff of Madison County, Alabama on March 3, 1998. *Id.* She earned multiple commendation medals and did tours of duty in Germany and Korea. *Id.*

Henderson also failed to present any evidence of Curry's long medical history fighting hypothyroidism (which ultimately ended her law enforcement career) and other related mitigating evidence such as her sexual assault in the military, which, decades later, still impacted her ability to sleep, resulting in her being prescribed Elavil as a sleep aid. Doc. 17-1, p. 1698.

During sentencing argument, the prosecutor commented on Curry's right to remain silent, and said, "There's been no assumption of any kind of case responsibility from Curry or any of her family members. All they want is mercy… And I've heard no – no hint of remorse. Oh, I have from the family members. **<u>But it's not coming from the defendant</u>. Talk is cheap. Show me some remorse. Show me that you're sorry for your actions.**" *Id.* at 1081. The State also continued to falsely claim that Curry was under the influence of controlled substances while arguing for a life sentence:

```
     She knew it was wrong that day to take
prescription medications -- and she also had some
controlled substances in her blood -- and get on a
highway and travel the speed she was traveling.
```

Doc. 12-5, p. 1078 (emphasis added).

Henderson also failed to inform Curry she could make a statement at sentencing to the court, so she was unprepared when asked by the court. *Id.* at 1094. After she made an impromptu speech, and without a second of deliberation, Judge Rice immediately sentenced Estella Curry to life in prison. *Id.* at 1102.

### Appellate Procedural History

Henderson timely appealed her conviction. Doc. 12-2, p. 384. However, the only matters appealed were (1) if the trial court erred in finding Curry competent to stand trial; (2) whether the court erred in not allowing Curry to proceed *pro se* (Issues 2 and 4 of this appeal); and (3) whether the court should have acquitted Curry because the State failed to prove she was under the influence of a controlled substance (Issue 1). The Alabama Court of Criminal Appeals ("ACCA") affirmed the conviction and sentence. Henderson appealed to the Alabama Supreme Court, which denied her appeal.

Curry, now represented by Leroy Maxwell, Jr., filed a timely Rule 32 collateral review motion on October 23, 2019. Maxwell's Rule 32 motion only

argued that (1) Curry was not competent to stand trial; (2) the court erred in denying Curry's right to self-representation (Issues 2 and 4); (3) the trial court erred in admitting irrelevant and overly prejudicial evidence; (4) prosecutorial misconduct in the reading of Bible verses during closing argument denied Curry a fair trial; and (5) the court erred by admitting evidence and testimony of Curry's blood and urine test results (Issue 1). The Rule 32 motion was denied, and the denial of the Rule 32 motion was affirmed on appeal.

## IV.    <u>Standard of Review</u>

When ruling a denial of a habeas petition under 28 U.S.C. § 2254, the Court reviews both questions of law and mixed questions of law and fact *de novo*. *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1208 (11th Cir. 2007); *Maharaj v. Sec'y for Dep't of Corr.*, 432 F.3d 1292, 1308 (11th Cir. 2005), *cert denied.* In evaluating the Alabama court's decision that Curry request to represent herself, the applicable standard is whether the state court's decision was based on an unreasonable determination of facts in light of the evidence. 28 U.S.C. § 2254 (d)(2); *Miller-El v. Cockrell*, 537 U.S. 322, 341-342 (2003)*; Wood v. Allen*, 558 U.S. 290, 300-301 (2010). The presumption found in 28 U.S.C. 2254(e)(1) does not apply to the state court's *decisions*, as the controlling standard for challenging a state court's decisions based on an unreasonable determination of facts is plainly laid out in 28 U.S.C. § 2254(d)(2) (emphasis added); s*ee also Miller-El*, 537 U.S. 322, 341-342 (2003).

27

## SUMMARY OF THE ARGUMENT

The State purposefully used false evidence to indict and convict an Army veteran and former military police officer of reckless murder. The actual evidence showed Curry had **NO** opiates or other controlled substances in her system. The truth of what transpired on May 7, 2014 did not support bringing a murder charge against Curry and, much less, support her conviction or the maximum sentence of life in prison.

Second, Curry tried for a full year to rid herself of court-appointed counsel, without success. The trial judge denied her request for self-representation six months before trial. On the eve of trial, Curry asked again to represent herself and be given time to prepare as the attorney forced upon her by the court had done practically nothing to prepare for trial. The trial judge refused, stating he did not have a formal written request from the defense. Curry's counsel provided the written request after the hearing, yet still, the judge denied Curry's constitutional right to represent herself.

Third, Curry is actually innocent of reckless murder as the new evidence – provided in part by the State's own toxicologist who testified against Curry – proves she was not under the influence of any controlled substances, much less "opiates," which the State had to prove for reckless murder with driving under the influence.

28

## ARGUMENT

V. **Curry's Unwaived Claims: the State's Use of False Evidence and Her Sixth Amendment Right to Self-Representation.**

A. **A.    The Primary Evidence Used Against Curry was <u>FALSE</u>, and, Under the State Precedent of *Watson v. State*, the Evidence Could <u>Not</u> Support a Conviction for Reckless Murder.**

The State's purposeful action in this case in misrepresenting the evidence cannot be excused. There is simply no amount of pointing at "good ingredients" in the record that justify the use of false evidence that will make this first-degree murder conviction, "okay." The Alabama Court of Appeals and the district court have both tried to shore up the State's illegal acts, citing the State's speed estimate—divined through the spurious scientific process of looking at a scratch on Curry's speedometer—but nothing excuses the DA's utterly immoral conduct. Curry's conviction simply cannot stand.

The United States Supreme Court has held repeatedly that a state criminal conviction cannot stand where the prosecution makes "<u>consistent and repeated misrepresentation[s]</u>" of what the key evidence actually is **because doing so is the presentation of false evidence**. *Miller v. Pate*, 386 U.S. 1, 87 S. Ct. 785 (1967). In *Miller*, the state convicted the defendant of a brutal rape and murder of a young girl and sentenced him to death. *Id.* at 2. A "vital component" of the State's case was adult male underwear covered in red-brown stains that was found discarded a mile

29

from the crime scene. *Id.* at 3. During the trial, the State referred to the underwear as "bloody shorts" and "a pair of jockey shorts stained with blood." *Id.* A forensic examiner testified at trial that the stains were human blood of the same type as the murdered girl. *Id.* at 4. However, during the habeas proceeding, additional testing proved there was not a trace of human blood on the underwear, and that the State knew this fact prior to trial. *Id.* at 5. The Court surmised:

> **The prosecution's whole theory with respect to the exhibit depended upon that misrepresentation**. For the theory was that the victim's assailant had discarded the shorts *because* they were stained with blood. <u>A pair of paint-stained shorts, found in an abandoned building a mile away from the scene of the crime, **was virtually valueless** as evidence against the petitioner</u>. The prosecution deliberately misrepresented the truth.

*Miller*, 386 U.S. at 6, 87 S. Ct. at 787-88. (Italics in original. Other emphasis added.) The Supreme Court ultimately held that "<u>the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence</u>. There has been no deviation from that established principle. There can be **<u>no retreat</u>** from that principle here." *Miller* at 7 (internal citations omitted)(emphasis added).

In Curry's case, the DA's whole case depended on the jury believing Curry was under the influence of opiates at the time of the crash. He repeatedly used the terms "controlled substances" and "opiates" to charge, indict, and convict Curry when he had the true evidence in his hand three years before the trial. Yet, the false fact that Curry had opiates in "her system," or "her blood" was peppered throughout

30

the State's *entire case*. Excluding opening and closing statements (again, because Judge Rice did not direct that they be recorded for a first-degree murder trial), the word "opiate," "opiates," or the name of types of opiates (i.e. "oxycodone," "Percocet, Lortab") was said by the prosecution, a state witness—or by the attorney forced upon Curry by the court—twenty-two separate times. Docs. 12-3 – 12-5, pp. 847, 851-853, 900-01, 904, 1015, 1032, 1041, 1089. The inference can be made that opiates was mentioned many more times in opening and closing by both the State and by Cooper, Judge Rice's chosen counsel for Curry. This use of the term "opiate" was clearly intentional and a "vital component" to the State's case against Curry.

This is also not a minor mistake or a "technicality" as the district court phrased it and even crafted into the wording of Issue 2, either. Testifying that "opiates" were in Curry's "system" was one of the primary themes of Nurse Qualls' testimony. The State's prosecution team referred to Curry voluntarily driving down the highway with opiates in her system four separate times in sentencing and sentencing argument. Doc. 12-5, 1015, 1032, 1041, 1089. And it had to be, for the type and number of drugs goes directly towards the level of recklessness the State had to prove beyond a reasonable doubt.

In Alabama, the *only* difference between the reckless behavior that supports (1) reckless murder versus (2) manslaughter versus (3) criminal negligence is simply a matter of degree. *See Watson v. State*, 504 So.2d 339, 345-346 (Ala. Crim. App.

31

1986) (discussing the Model Penal Code's explanation of recklessness and applying it in Alabama in a reckless murder case). Stating that someone has taken "opiates" (a dog whistle for illegal or prescription drug abuse, i.e., very reckless behavior) or "controlled substances" (which includes opiates and other narcotics) when the defendant in fact <u>has been proven by the State forensic lab not to have done that</u> directly and substantially affects the degree of recklessness being communicated by the prosecutor to a jury. The prosecution's deliberate use of inaccurate terms that are directly contradicted by the evidence in hand is overtly and intentionally misleading. It is directly akin to continuing to wrongfully describe red-stained underwear as "bloody" when the State *knows*—via its own testing—that the red stain is just paint. Even the district court judge agreed that "the prosecutor disproportionately focused on Curry's rapid drug screen being positive for opiates when her formal toxicology results were negative for them." Doc. 53, p. 2242.

However, the district court held that a conviction for first degree murder and a life sentence is "okay" because Curry "ingested a cocktail of medications…and drove somewhere around at least 100 mph." *Id.* But this is, once again, a fundamental mischaracterization of Curry's actions. She did not "ingest a cocktail," as in consume a mix of medications to "get high" or "for fun" and then intentionally speed down the highway. The reality is, all Curry did was take her regularly prescribed

32

medications and then drive across the country as *millions* of middle-aged Americans do every single day.

Alabama law also supports the above argument. The Alabama Supreme Court has been very clear that reckless murder requires "a determination on the part of the defendant 'to take life' without knowing or caring who the victim may be." *Napier v. State*, 357 So. 2d 1011, 1013 (Ala. 1978). Overtime, the law in all States has recognized that driving while under the influence of alcohol or illegal drugs is a "circumstance" that allows a jury to find that the actor behaved with "manifest indifference to human life as long as there is something more than simply driving after having consumed alcohol." *Allen v. State*, 611 So. 2d 1188, 1192 (Ala. Crim. App. 1992). Without "opiates" falsely thrown into this prosecution, the State could not rely on the *Allen* line of cases and was required by *Napier* to prove beyond a reasonable doubt that Estella Curry consciously determined to take a life. *See Watson v. State*, 504 So. 2d 339 (Ala. Crim. App. 1986).

*Watson* is controlling in Curry's case. In *Watson*, a woman was found guilty of reckless murder in violation of § 13A-6-2(a)(2) and sentenced to life in prison for accidentally hitting and killing a twelve-year-old pedestrian. 504 So. 2d at 340. She was driving behind a passenger bus and decided to pass the bus on a hill going 70 mph in a 55 mph no-passing zone when she hit the minor just as she crested the hill. *Id.* Toxicology revealed she had no alcohol in her blood, but that she had taken a

33

therapeutic dose of serentel, a drug used to treat schizophrenia, and that she had been prescribed lithium (although this was not the subject of a test). *Id.* These drugs were shown through the testimony of a toxicology expert to cause sleepiness and delayed reaction time. *Id.* The appellate court, citing to the Alabama Supreme Court's decision in *Napier*, explained that <u>reckless murder is akin to intentional murder</u>, which requires a level of recklessness that the person <u>knows</u> her actions as a driver "will, in all probability, lead to harm to another." *Id.* at 346-347. There was no evidence in Watson's case that she determined to hit the victim or that she might hit someone and proceeded anyway. *Id.* at 347. The case was reversed and remanded for a new trial. *Id.* Curry's case sits on all four corners with *Watson*.

In Curry's trial, the State sought to bypass the *Napier* scienter element by presenting evidence of intoxication when there was <u>no evidence of voluntary intoxication</u>. Due to such prejudicial and intentional conduct on the part of the prosecution, *Miller* and *Watson* require habeas relief for Estella Curry.

**B.    Curry's Sixth Amendment Right to Self-Representation was Violated.**

i. The Sixth Amendment and *Faretta*

The Supreme Court of the United States has held that the Sixth Amendment, applicable to the States via the Fourteenth Amendment, guarantees a criminal defendant the right to represent themselves at trial. *Faretta v. California*, 422 U.S.

806 (1975). *Faretta* expressly rejected the notion that a State may haul a person into its criminal courts and force a lawyer upon her <u>when she expressly rejects such actions</u>. *Id.* at 807. If a criminal defendant voluntarily and intelligently elects to represent themselves in a criminal proceeding, a State must accede to their demand. *Id.* at 835-36.

In *Faretta*, well before the trial date, the defendant asked to represent himself. *Id.* at 807. The court determined he had a high school education and did not want a public defender. *Id.* The judge thought Faretta was "making a mistake," but initially accepted his waiver. *Id.* at 808. Several weeks later, but still well before trial, the court held another hearing, sua sponte, testing Faretta's ability to conduct his own defense by testing his knowledge of the hearsay rule and law governing juror selection. *Id.* After considering his responses, the judge ruled Faretta had no constitutional right to defend himself and appointed a public defender. *Id.* at 808-10. The judge also rejected Faretta's efforts to file pro se motions on his own behalf. *Id.* at 810. Throughout the trial, the judge required the defendant's defense to be conducted only through the court appointed lawyer. *Id.* at 811. Faretta ultimately appealed the denial of his right to represent himself to the Supreme Court. *Id.*

Based on a lengthy historical analysis, the Supreme Court held the Sixth Amendment's guarantee of counsel was *an aid* to a willing defendant and not an organ of the State to be interposed between an unwilling defendant and his right to

35

personally defend himself. *Id.* at 820. To force a lawyer upon a criminal defendant would only serve to lead the defendant to believe the law contrives against him. *Id.* at 834. Therefore, "**unless the accused has acquiesced in such representation**, the defense presented is <u>not</u> the defense guaranteed him by the Constitution." *Id.* at 821 (emphasis added).

The Supreme Court then analyzed if Faretta had properly invoked his right. He clearly and unequivocally declared to the trial judge that he wanted to represent himself and did not want a PD. *Id.* at 835. Faretta was literate, competent, and understanding, and he knowingly and intelligently waived his right to counsel. *Id.* The defendant's technical legal knowledge was irrelevant to an assessment of his knowing exercise of the right to defend himself. *Id.* at 835-36. Therefore, in forcing the defendant to accept against his will a court-appointed public defender, the California courts deprived the defendant of his constitutional right to conduct his own defense. *Id.* at 836.

   ii. The Current Record Demonstrates Curry Made MULTIPLE Clear and Unequivocal Requests for Self-Representation and ACCA's Decision She Had Not Even Made a Single Request was an Unreasonable Determination of the Facts.

When ACCA reviewed the record from Curry's trial, the court only focused on the June 12, 2017 pre-trial hearing that occurred the day before trial. In their fact section, ACCA does not mention the *first* unsuccessful attempt by the trial court to

assign Curry a public defender, or the pro se motions filed by her in December 2016 and January 2017 strongly stating her desire to NOT to be represented by court-appointed counsel after the court, sua sponte, decided in August 2016 she was indigent and assigned Cooper. ACCA also failed to mention the January 31, 2017 hearing to remove her court-appointed attorney *at all* or the court's order denying Curry's motions. All that ACCA recites regarding the ten months between the grant of Brown's Motion to Withdraw on August 9, 2016 and the June 12, 2017 pre-trial hearing is the following:

```
131.) On August 9, 2016, Brown's motion to withdraw was
granted.

    Shane Cooper was then appointed to represent Curry. On
December 6, 2016, Curry sent a pro se letter to the court
asking the court to remove Shane Cooper as her trial counsel
alleging, among other things, that he was unprofessional and
was not representing her best interests. On June 12, 2017,
Cooper filed a motion to withdraw as Curry's counsel citing
her motion.
```

Doc. 12-10, p. 1432. Even a causal reading of the current record demonstrates this recital of the relevant events that occurred in the last half of 2016 is just wrong. To summarize the facts laid out in detail in the fact section above, the following pre-trial events occurred relevant to Curry's Sixth Amendment claim that ACCA should have considered in their review of the claim:

-   **<u>January 20, 2015</u>**: During an actual hearing, the trial court attempted to declare Curry indigent and assign a public defender. Curry became "very

37

argumentative," the PD withdrew, and the court "withholds appointing counsel." Doc. 12-1, p. 134. Curry was ordered to fill out an "Affidavit of Substantial Hardship." She did so, indicating she has the disposable income available to hire an attorney; and also handwrites and signs or initials three times that, "I do not want a public defender." *Id.* at 177.

- **July 29, 2015 – August 4, 2016**: Curry hired Attorney Brown. *Id.* at 199. By the summer of 2016 she had become dissatisfied with his efforts, and Brown eventually filed a Motion to Withdraw on August 4, 2016. *Id.* at 262.

- **August 9, 2016**: In one two-line order, Judge Rice granted Brown permission to withdraw as paid counsel, declared Curry indigent, and appointed Cooper as her counsel. *Id.* at 264. No hearing was held.[5] *See id.* at 142.

- **December 6, 2016**: Curry filed a pro se motion requesting Cooper be removed because he was assigned by Judge Rice and seemed to be working for the court because he was ignoring Curry and her family's efforts to figure out what he was doing to defend her. *Id.* at 270-71. Although the court ignored

---

[5] Later, during the June 12, 2017 hearing, Judge Rice stated, "Cooper was appointed by the Court because *it appeared* you were indigent and were unable to afford an attorney." Doc. 12-2, p. 452. It is not clear how the court determined Curry was indigent as the only information before the court was the 2015 Affidavit of Substantial Hardship and the fact Brown was paid by Curry for a full year, which directly cut against this "appearance" of indigency.

Curry's prior pro se motions, on December 8, 2016, the court set this pro se motion to be heard on January 31, 2017. *Id.*

- **January 11, 2017**: Curry attempted to file two additional motions complaining of how ineffective Cooper was, that Judge Rice secretly assigned him, and <u>she had been denied her right to choose her own counsel.</u> *Id.* at 272; 288. The court clerk informed Curry via a letter dated January 23, 2017, that the court would only consider pleadings filed by Cooper, her counsel of record. Doc. 12-2, p. 296.

- **January 31, 2017**: According to the current record, Curry's December 6, 2016 motion was heard. Doc. 12-1, p. 143. The court denied Curry's motion without explanation. Doc. 12-2, p. 297.

- **June 6-8, 2017**: Curry filed three motions, all of which were denied because the court again said Curry was represented by Cooper:

    (1) a change of venue request, in part because of the "court forced defense attorney's lack of competence and/or ineffective assistance." (Doc. 12-2, p. 299.);

    (2) a motion directly asking again for Cooper's removal due to incompetence (*Id.* at 301); and

    (3) a motion asking Judge Rice to recuse himself because he had,

**"[d]enied Sixth Amendment rights, forced representation by appointing**

39

attorney not requested. **Denied request for self-representation**." (*Id.* at 302, emphasis added.)

All of these actions and pro se motions should have been considered by ACCA as it then turned to the June 12, 2017 hearing. ACCA unreasonably made their decision *entirely* on what occurred during that June 12, 2017 hearing, ignoring the pre-trial history outlined above. *See* Doc. 12-10. If ACCA had considered that prior history, then the following occurrence at the end of the June 12, 2017 hearing might have been made clear in the mind of the reviewing jurists. As is detailed in the fact section above, Judge Rice already determined Curry was competent to stand trial, making a point to state on the record that Curry was "extremely articulate…very intelligent…[and] It's obvious that you have a grasp of the charges that are against you." Doc. 12-2, p. 455. The hearing continued for some time and then the following exchange occurs:

> THE COURT: I don't have a formal request from her saying, Judge, I want to be my own lawyer and I will sail this ship myself. And she's not made that formal request to the Court. Now, whether I grant it or not, 'd have to think. But that's not in front of me at this point in time.
>
> DEFENDANT: Can I just say this, Your Honor? **I asked in January,** **_when we were here in January_ I asked** –
>
> MR. COOPER: Judge, she's not –
>
> DEFENDANT: **in writing and you denied that.**
>
> MR. COOPER: -- look to make this –

40

THE COURT: Well, I can only hear from one at a time.

Ms. Curry –

DEFENDANT: Yes, sir.

THE COURT: -- you're saying you want to be your own lawyer?

DEFENDANT: No. At this time I'm telling you I can't make an informed or intelligent decision **because I asked in January and it was denied**. So I'm saying at this point, <u>I can't make an informed or intelligent decision about it</u> **because of the fact that all the other things <u>that have come up today</u>**.

Doc. 12-2, 483-84 (emphasis added).

Clearly, Curry had asked in January to represent herself "when we were here" at the January 31, 2017 hearing, <u>but Judge Rice denied her request</u>. Judge Rice did not deny that she made the request. He does not say, "What are you talking about?" or, "That's not what happened." The judge instead asked Curry if she wanted to represent herself now, six months later, the day before her trial for murder. Curry again said she asked in January—<u>when she had *time* to prepare for her defense</u>—but it was denied. Again, no correction from the court. Given everything that was mentioned at the hearing—that Cooper said he is not ready to represent her at the trial that starts *the next day*, but that Judge Rice repeatedly said he would not delay the trial to give her time to prepare—now she is unsure. And what untrained layperson would not be unsure what to do in such an impossible situation? But

ACCA did not consider that effort or the impossible situation the court placed the defendant in. Instead, ACCA stated that:

> Although there was a lengthy discussion on this issue during a pretrial hearing [on June 12, 2017], the court expressly stated during that hearing that it was not going to rule on that issue until Curry decided whether she wanted to represent herself at trial. Curry, however, **never took advantage of that opportunity following that hearing**, and her case proceeded to trial with her trial counsel, Shane Cooper, representing her throughout the proceedings.

Doc. 12-10, p. 1504 (emphasis added).

This factual determination was also incorrect. Not agreeing with the court's inconsistent conclusion at the end of the June 12, 2017 hearing, Cooper filed another Motion to Withdraw in which Cooper stated:

> Defendant has previously filed a pro se motion and [sic] requesting to represent herself. <u>The Court denied this motion in the presence of the Defendant at a hearing on the motion</u>.

Doc. 12-1, p. 315 (emphasis added). This is further verification from Cooper, an officer of the court, that Curry's statement during the June 12, 2017 hearing that "I asked in January, when we were here in January…and you denied that" was an accurate summation of her clear and unequivocal spoken effort to represent herself and then a denial by the court. But Cooper continued:

> <u>Defendant has clearly indicated</u>, **by her statements in open court <u>and</u> previous pro se filings**, her desire to have me removed as counsel, that she does not seek a replacement attorney, and **<u>if given time to prepare,</u> she would prefer to represent herself**.

42

Doc. 12-1, p. 316 (emphasis added).

The following day, at the start of the trial, the judge asked if the defense was ready, to which Cooper responded, "Defense is ready except for the pending motion." This pending motion was Cooper's Motion to Withdraw so Curry could represent herself. In response, the judge stated, "And I've reviewed your motion, and it is denied." Doc 12-2, p. 492 and Doc 12-1, p. 320 (Order). Contrary to ACCA's factual determination, there was one final effort for Curry to represent herself—if given the time she should have had in January—but it was denied by the same judge who denied her Sixth Amendment right six months prior.

As the current record clearly establishes, ACCA's factual findings are misplaced. Curry DID make a clear and unequivocal request to represent herself— on January 31, 2017—but the court denied it. Although Curry made an 11th hour effort to rid herself of both her court-appointed counsel and the Judge who forced him upon her, and Curry clearly and unequivocally asked to represent herself—if given the time to prepare she should have had in January—and even though the court entered into a *Faretta*-like determination that she was competent and voluntarily making this choice, the court doggedly refused to allow her access to the evidence the State had had in its possession for three years, or allow her the time to prepare to represent herself. Which forced Curry to choose to represent herself *the next day* and without ever having seen the evidence against her, or to use the unprepared public

43

defender she had tried to rid herself of for months. Given the true Catch-22 the record proves Judge Rice placed Curry in, ACCA's analysis of the case was clearly unreasonable. Curry is being held in violation of the Constitution of the United States and is entitled to relief under 28 U.S.C. § 2254.

### C.   In Denying Curry's Claim Regarding Self-Representation, ACCA Unreasonably Applied *Faretta v. California*, 422 U.S. 806 (1975).

A state court's decision is an "unreasonable application" of federal law if the court identifies the correct Supreme Court precedent but unreasonably applies it to the facts of the case. *Sears v. Warden GDCP*, 73 F.4th 1269, 1279 (11th Cir. 2023) (*citing Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). In this case, ACCA correctly identified *Faretta* as the governing law, however, ACCA unreasonably applied *Faretta* in determining Curry did not "clearly and unequivocally" indicate she wanted to represent herself.

The similarities to *Faretta* began when Curry was arrested and evaluated for indigency status. Curry indicated on the "Affidavit of Substantial Hardship" form that "I do not want a public defender." Doc 12-1, p. 134. And during the arraignment hearing, like in *Faretta*, because of her statements to the court, Curry initially was not assigned a PD. *Id.* at 177-78.

In *Faretta*, the judge initially allowed the defendant to represent himself, but later retracted his decision, forcing a PD upon Faretta. For Curry, as detailed above,

once she broke off her year-long relationship with the attorney she hired, Judge Rice, sua sponte and without holding a hearing, determined that Curry was indigent and assigned Cooper as her court-appointed attorney.

Just like in *Faretta,* Curry repeatedly filed pro se motions on her own behalf, in her case, asking for Cooper's removal, but also asking that she begiven access to the evidence against her. And exactly as in *Faretta,* Judge Rice denied Curry's motions and ruled her defense could <u>only</u> be conducted through Cooper.

Also, like *Faretta*, Curry repeatedly made clear and unequivocal requests to represent herself, which were denied. As detailed above, Curry's actions on January 31, 2017, and again on June 12, 2017 show a clear and unequivocal request to represent herself if the court would permit her access to the evidence against her and give her reasonable time to prepare. Like in *Faretta*, Curry's requests were denied.

Finally, as in *Faretta*, Judge Rice found Curry to be "highly articulate…very intelligent…[and] competent." Further, Curry voluntarily exercised her informed free will to represent herself. There is no evidence to the contrary.

The factual record of this case is striking similar to that of *Faretta*. Both cases had a criminal defendant who (1) clearly and repeatedly stated they did not want a public defender, (2) made multiple clear and unequivocal requests for self-representation, (3) filed *pro se* motions after attempting to act as their own counsel, which were denied or ignored, (4) were literate, understanding, and determined by

45

the court to be competent, and (5) knowingly and intelligently waived their right to counsel, yet were forced to use a court appointed attorney anyway. As it was in *Faretta*, Curry's case is a clear violation of the Sixth Amendment right to self-representation. Because the ACCA came to a different conclusion than established federal law on nearly identical facts, this was an unreasonable application of clearly established law. As such, this Court must overturn the district court's ruling and hold that Curry was denied her constitutional right to self-representation. As a result, she is being held in violation of the Constitution of the United States and is entitled to relief under 28 U.S.C § 2248.

**VI.** <u>**Curry's Procedural Default Should be Excused and her Substantial Claims Reviewed**</u>

The Rule of Law underpins the very fabric of our entire society. But the evidence in Curry's case is clear: not only was the Rule of Law ripped asunder when the prosecutors falsified their evidence against Curry, and when the judge forced his hand-picked counsel upon Curry over her repeated objections and requests to represent herself, but the insult to our Constitution was completed by the shockingly ineffective effort of that court-appointed counsel to either prepare for trial or challenge the State's "evidence"—almost as if it was intentional. Why it matters whether sub-standard appellate counsel failed to first make the argument should be immaterial to the <u>obvious</u> constitutional failures of Curry's court-appointed counsel.

However, because case law does not currently allow Curry at least one habeas review for IATC when the need for relief is obvious, grave, and substantial, Curry will likely spend the rest of her life in prison because of this irrational procedural prohibition. A federal court should address the obvious and abject failures of the Alabama justice system and hold them accountable. Thus far, that has not occurred.

**VII.    Curry Qualifies for the Fundamental Miscarriage of Justice Exception**

As to Curry's fundamental miscarriage of justice claim, the district court stated that the magistrate judge "addressed this issue thoroughly" and adopted those findings, wholesale. *Id.* at 2239. As is explained below, the magistrate judge's evaluation of Curry's fundamental miscarriage of justice claim is incorrect and the district court's adoption of it should not be followed.

Ordinarily, procedurally defaulted claims are barred from federal habeas review. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991). However, the Supreme Court has established two narrow exceptions to this rule, one of which is if failure to consider the procedurally defaulted claim will result in a "fundamental miscarriage of justice." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). As this Court has recognized regarding such claims, "a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense. In addition, 'to be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." *Johnson v. Alabama*, 256 F.3d 1156, 1171

47

(11th Cir. 2001)(internal citations omitted). "More likely than not" is the standard that must be shown, not the clear and convincing required of death penalty habeas petitions. *Calderon v. Thompson*, 523 U.S. 538, 559(1998).

The Supreme Court has repeatedly held that the fundamental miscarriage of justice exception "concerns a petitioner's 'actual' innocence rather than his 'legal' innocence." *See* i*d. See also*, *Johnson v. Alabama*, 256 F.3d at 1171. However, in this case, Curry was found guilty of reckless murder "*while driving under the influence*," which is a crime that is itself a type of legal fiction within the greater body of caselaw on reckless murder. "Regular" reckless murder normally requires evidence to be presented that there was "a determination on the part of the defendant 'to take life' without knowing or caring who the victim may be." *Napier v. State*, 357 So. 2d 1011, 1013 (Ala. 1978).

But in the context of "murder by DUI," Alabama (and all States) long ago allowed evidence that the accused was consciously consuming alcohol or mind-altering drugs (i.e. "controlled substances") and then chose to drive which resulted in the death of another, to stand in the place of the scienter requirement to prove "a determination on the part of the defendant to take life." *See e.g. Allen v. State* 611 So. 2d 1188, 1191-92 (Ala. Crim. App. 1992) (discussing the development of this doctrine in Alabama in the mid-20th Century.) Therefore, to prove actual innocence for "reckless murder by DUI," Curry has to present "reliable evidence not presented

48

at trial" that she was not under the influence of controlled substances, because then the State cannot rely on the legal fiction permitted by the *Allen* and *Napier* line of cases. A conviction of the lesser included offenses of manslaughter and vehicular/criminal homicide in this context—without presentation of evidence by the State that Curry "determined to take life" by driving at a high rate of speed—logically also must rely on this legal fiction as there is no other evidence that proves the required scienter element in this case. The new evidence Curry presented overwhelmingly demonstrates that Curry did not ingest alcohol or controlled substances.

Michael Weaver, the State's toxicologist that testified *against* Curry at her trial, and Dr. Michael Cox, double board-certified in emergency medicine and toxicology, and the Director for Mississippi Regional Poison Control Center, both testified that Curry had no opiates or controlled substances in her system at the time of the crash. Docs. 17-5;17-1. Furthermore, they also testified that the urine drug screen relied on by the State does not prove that she was driving under the influence of opiates or any controlled substance. *Id.* Furthermore, Weaver also explained that Nurse Qualls was not qualified to testify that Curry "had opiates in her system." Both Weaver's and Dr. Cox's declarations directly disprove the State's argument that Curry was driving under the influence of opiates.

49

The magistrate judge says that driving under the influence is not an element of reckless murder and that the difference between a "controlled substance" and "prescription medications" is a "technicality." Doc. 50, p. 2158; 2175. His argument is just wrong. The reckless conduct under the statute is defined by the action(s) of the accused as alleged by the State. *See e.g. Watson v.* State 504 So.2d 339 (Ala. Crim. App. 1986) *cert. denied* (March 27, 1987). Furthermore, in her trial, Judge Rice also instructed the jury on the elements of reckless murder—in Curry's specific case. Judge Rice said:

> To convict, the State must prove beyond a reasonable doubt each of the following elements of murder, One, that Richard Harmon Walker is dead. Two, that the defendant, Estella Curry, caused the death of Richard Harmon Walker by — **and the alleged act is what ' s actually contained in the indictment** — **driving at a high rate of speed and while under the influence of one or more controlled substances**, hit another vehicle causing the death of Richard Harmon Walker. And next, that in committing the act which caused the death of Richard Harmon Walker, the defendant acted with extreme indifference to human life.
>
> …
>
> If you find that the State has failed to prove — the State not the defendant — **if you find that the State has failed to prove beyond a reasonable doubt <u>any one or more of the elements of the offense of murder</u>, then you cannot find the defendant guilty of murder**.

Doc. 12-4, 926-28 (emphasis added).

The conduct that *had* to be proven—beyond a reasonable doubt, as stated by the judge to the jury—was that Curry was "driving at a high rate of speed and while

under the influence of one or more controlled substances." The new evidence **provided by the State's own toxicologist** and Dr. Cox proves, "more likely than not," that no reasonable juror would have found that Curry was under influence of a controlled substances and certainly not opiates. Does the district court really think that having the State's toxicologist provide a declaration for the defendant would not convince a reasonable juror that Curry was not under the influence of controlled substances at the time of the crash?

The magistrate judge also claims this "technical" element on what drugs were in Curry's system is immaterial, because the State presented "adequate" evidence that Curry was driving at an extreme speed which a juror could have relied on to find Curry guilty of reckless murder or a "lesser degree of crime."[6] Doc. 50, p. 2159. But that is also wrong. First and foremost, because the State would no longer be able to rely on the *Allen* and *Napier* line of cases, to substitute voluntary intoxication for the scienter element. Second, accident reconstructionist Jim Griffin's sworn declaration provided ample reasons why the State's evidence on "slap marks" used to determine Curry' 126-128 mph speed would have been strongly challenged, namely that

---

[6] The magistrate cited to *Howard v. Barrett*, No. 4:12-cv-01845-KOB-JEO, 2014 U.S. Dist. LEXIS 116486 (N.D. Ala. Aug. 21, 2014) for the proposition that "Curry still would not be 'actually innocent' but only perhaps guilty of a lesser degree of crime." *Howard* is an unpublished opinion denying habeas review because of the untimeliness of the petition. It contains no analysis on actual innocence or to anything regarding, "lesser degrees of crime."

speedometer needles will often move at an angle if the vehicles collide at an angle, as occurred in this case. Doc. 17-6, p. 1818-19.

Furthermore, Griffin determined Curry's speed in a demonstrably reliable scientific method by using the ACM <u>data</u> as well as the eye-witness account of Holsonback that Walker was traveling at 78-79 mph just before the crash, which indicated that, <u>more likely than not</u>, Curry was travelling at 96 to 98 mph. Doc. 29-1, p. 2006. While it is speeding, 96 to 98 mph is magnitudes different than the 126 to 128 mph estimate derived from looking at scratches on a speedometer.

In light of the new evidence presented by Dr. Cox, Weaver, and Griffin, no reasonable juror would have convicted Curry of reckless murder. The State's case hinged on the theory that Curry was high on opiates and driving recklessly at an extreme speed *because of* her "intoxication" caused by the opiates, both of which are refuted by the new evidence well beyond the "more likely than not" burden. Without proof of intoxication and reckless driving, the State cannot meet the elements of reckless murder under Alabama law and Curry's conviction must be overturned as she is innocent of "murder by DUI."

## **CONCLUSION**

Curry was convicted using false evidence, denying her of her constitutional right to a fair and impartial trial. The trial judge denied her Sixth Amendment right to represent herself. Lastly, Curry is actually innocent of the crime she was convicted

52

of. As such, Curry is being held in violation of the United States Constitution and her habeas petition is due to be granted under 28 U.S.C. § 2254.

Respectfully submitted on October 21, 2024,

Tyler J. McIntyre (ASB-1378-G61I)
John D. Hemmings, III (ASB-2728-Y12Q)
Alfred H. Perkins, Jr. (ASB-3979-R68A)

Of Counsel

STARNES DAVIS FLORIE LLP
100 Brookwood Place, 7th Floor
Birmingham, Alabama 35209
Telephone:  (205) 868-6000
Facsimile:  (205) 868-6099
aperkins@starneslaw.com
tmcintyre@starneslaw.com
jhemmings@starneslaw.com

*Attorneys for Petitioner Estella Curry*

54

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATIONS, TYPEFACE REQUIREMENTS, AND TYPE STYLE
REQUIREMENTS**

1.     This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B)(i) because this brief contains 12,644 words, excluding the parts of the

brief exempted by Fed. R. App. P. 32(f), as counted by the word count function of

Microsoft Word word processing software, and including the words contained in the

pictures cut and pasted into the brief.

2.     This brief complies with the typeface requirement of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionately spaced typeface using the Microsoft

Word word-processing software in 14-point Times New Roman font.

Tyler J. McIntyre (ASB-1378-G61I)
John D. Hemmings, III (ASB-2728-Y12Q)
Alfred H. Perkins, Jr. (ASB-3979-R68A)

Of Counsel

STARNES DAVIS FLORIE LLP
100 Brookwood Place, 7th Floor
Birmingham, Alabama 35209
Telephone:  (205) 868-6000
Facsimile:  (205) 868-6099
aperkins@starneslaw.com
tmcintyre@starneslaw.com
jhemmings@starneslaw.com

*Attorneys for Petitioner Estella Curry*

55

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing **APPELLANT'S MOTION FOR LEAVE TO FILE BRIEF THAT DOES NOT COMPLY WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a)(7)** has been filed with the Clerk of the Court using the CM/ECF system which is supposed to send electronic notification of such filing to counsel of record below:

William D. Dill
Assistant Attorney General
Office of the Attorney General
Criminal Appeals Division
501 Washington Avenue
Montgomery, Alabama 36130
docketroom@AlabamaAG.gov

This 21st day of October, 2024.

Tyler J. McIntyre (ASB-1378-G61I)
John D. Hemmings, III (ASB-2728-Y12Q)
Alfred H. Perkins, Jr. (ASB-3979-R68A)

Of Counsel

STARNES DAVIS FLORIE LLP
100 Brookwood Place, 7th Floor
Birmingham, Alabama 35209
Telephone:  (205) 868-6000
Facsimile:  (205) 868-6099
aperkins@starneslaw.com
tmcintyre@starneslaw.com
jhemmings@starneslaw.com

*Attorneys for Petitioner Estella Curry*

56